Your Honors, may it please the Court, I'm Scott Sterling, representing Balinesh Fantaye, the petitioner-respondent. Ms. Fantaye is a refugee from Ethiopia because she has a well-founded fear of persecution if she is to return to Ethiopia. There were a couple documents excluded from her trial on the grounds of hearsay, but according to the citation I just submitted to the Court this morning, Gu v. Gonzales, this Court reiterated on December 1st that hearsay is admissible if it is probative and the admission is MS. FANTAYE I'm sorry. You just gave us something this morning? MR. GONZALES Yes, Your Honors. MS. FANTAYE Oh, I see. Okay, thanks. MR. GONZALES Hearsay is admissible if it is probative and the admission is not fundamentally unfair. MS. FANTAYE That's my 28-J letters. They're really good. MR. GONZALES Date of December 1st? MS. FANTAYE Oh, okay. MR. GONZALES Oh, I didn't get any of that. I have one from December 1st. MS. FANTAYE Okay. MR. GONZALES Okay, Your Honors. The immigration judge made an adverse credibility finding based upon what appeared to be inconsistencies, but the inconsistencies were based upon translation errors and confusion. MS. FANTAYE What was the issue with not being able to find the tapes? Because obviously we've said the best evidence of whether translation errors cause an error in the IJ's decision is a bilingual translation of the tapes. MR. GONZALES Well, the tape was requested by my office shortly after the trial. The court, immigration court, said they couldn't find it, but somehow it magically appeared in Maryland for the transcription. But then after that, when it was requested again by my office, when it was sent, after it was sent back to Los Angeles, it was lost. They could not find it again. So without the tape, my client cannot prove that translation, that relevant material translation errors occurred, which caused the immigration judge to find that she lacked credibility because her story appeared to be inconsistent based on the translation errors. The judge did take over the hearing and acted as a prosecutor. And MS. FANTAYE Did the BIA make a specific finding of prejudices arising from the transcription? MR. GONZALES Well, the BIA's ruling was rather strange because they ruled that the translation errors were minor if they existed. But without the tape to see what the translation errors were and how major they were, I think it would be hard to make that determination. THE COURT What weight do we give to the statement of the BIA with respect to transcription? Do we ignore it and do it de novo? MR. GONZALES Well, I believe the Court can give some weight to the BIA's statement, but THE COURT Is there a standard of review? Or have you thought about it? MR. GONZALES I'm not sure what the standard of review is, Your Honor. Sorry. MS. FANTAYE Well, it's kind of an interesting question what you do when your assertion, well, when the IJ faces her decision on the fact that it's confusing testimony and it's unclear whether or not the interpreter spoke the same dialect as the petitioner. And there are several translation errors pointed out. But then the party that should be producing the tapes claims to have lost them. I mean, is there any law on that? Or is there anything that can be borrowed from regular civil procedure law? MR. GONZALES Yes, Your Honor. In my supplemental reply brief to this Court, I did cite various cases that said the burden is on the party that lost the tape to show that there was not prejudice. But without the tape, I don't know how they could meet that burden. So that's where that goes. THE COURT Well, the prejudice would be sustained by your own client. You'd certainly be aware if your client was prejudiced, wouldn't you? I mean, was there a specific quote in the tape that you were unable to get and put in the briefs here or bring to our attention? MR. GONZALES Well, I think things THE COURT Just the broad charge that the tape is lost, we're lost, and we want another trial is not going to do it with me anyway. I want to know what specifically  Okay. All right. The tape being lost in itself wasn't what caused it. What caused it was the translation errors, but then we can't prove it without tape. Here's the specific example, Your Honor. There was confusion in the timeline in the mind of the immigration judge because of the fact that she thought that the immigration judge thought there was only one arrest of the Respondent's, of my client's re-arrest, and because the translator wasn't translating correctly, that did not come through and got confused. The other big confusion was the dates. There's a difference of seven years and eight months between the Ethiopian calendar and the American calendar, and my client can't always do the conversion in her mind. She would say the Ethiopian date, the translator would not convert it, and so it created some confusion there, too. But there was also a number of occasions where the Vante's testimony was not directly responsive to the question and came out seeming confusing or nonsensical. If you read the transcription, for example, it says, For what government did her husband work? And she answers, The members to regime for military regime. It doesn't seem like they're on the same wavelength. I would agree, Your Honor, and I would contend that a lot of her answers were rather confusing, and I believe it's because of translation errors. But then the IGA says, No, it wasn't translation errors. It was because her story was obviously false, and she couldn't remember it exactly when she was testifying. So how do you respond to that? Well, I don't think the immigration judge raised the issue of translation errors. That was raised at the level of the BIA. Okay. Well, the BIA's response was that obviously because of this odd testimony, her testimony and her story was false. Well, one, the immigration judge did make a statement that was borrowed, maybe possibly borrowed by the BIA, that said when a story is made up, it's hard to keep it consistent, but I believe that the seeming inconsistencies were from translation errors. You know, even if there were translation errors and even if one were to conclude that the IGA can't rely on dates and sequences of events because they don't go to the heart of the claim for asylum, there still seems to be a lack of individualized persecution of Fante in the record. Well, basically, you know, there is her husband being arrested, and then he was held in custody all the way until this year, and then just released this year, and then re-arrested within the last few days. Her two daughters were both questioned when she filed for, after her June 2002 hearing, and one of them was arrested. Now one of them is living in the United Kingdom, and she has been granted political asylum there. The other one is living in exile in Ghana and is trying to get passage to a country that can grant asylum. She was assaulted to the point that her arm was twisted and injured. She was deprived. Her house was taken away from her. It was never given back to her. Her ‑‑ she was never granted a nursing license, as she should be granted, and there is a warrant out for her arrest according to the declaration of Tawodos Ababa, which is in the record, which he saw. He is a former member of the military in Ethiopia. To continue, Your Honors, so without the tape and without proper translations, my client cannot prove whether or not she was giving due process in a fair hearing, and so I would contend that based on the evidence in the record that the burden of proof should be on the Department of Justice to prove that she should not be granted asylum, or in the alternative, be granted a new trial with the immigration court, and if that is the option of the court, I would request that the court grant her a temporary work permit, because these proceedings do take an extensive period of time. Did she get voluntary departure? You don't know how to look that up. Right. Well, you're over your time. Why don't you look it up, and then you can answer that question. Okay. Thank you, Your Honors. Thank you, Your Honors. May it please the Court, Angela Miller on behalf of the respondent, the Attorney General. I really think there are two things going on in this case. One, my opposing counsel raised, had to do with the missing tape, and obviously the government has established that we cannot find the tape. I don't think that's fatal, however, to the government's position, certainly because the Petitioner here did submit a brief to the BIA, and in that brief, she had gone through the translation of the IJ hearing with another translator. I believe it was her nephew who was fluent in English. And as an aside, on the Petitioner's asylum application, she had marked that she herself was fluent in English. That just sits in the asylum application. And in the brief to the BIA, she set forth what she thought were the causes of the IJ's adverse credibility finding. She explained the miscommunications. Most of them seemed to be phonetical misspellings of transcription errors by the court reporter, perhaps rather than the translator. And also what she included was what her answers would have been, and she tried to explain to the BIA what her basis for persecution was. She never raised any concern that the translator omitted evidence such as there were additional things going on in Ethiopia that she experienced that didn't come across to the immigration judge. And what the BIA then had before it was her statement, which accompanied her asylum application, and she has never claimed that her statement was the subject of mistranslation or incompleteness or omissions. Her immigration hearing testimony, as well as the supplemental answers that she attached to her brief to the BIA. And looking at all of that, the Board of Immigrations just felt that what she experienced in Ethiopia did not rise to the level of persecution. The BIA also made an alternative finding. And if, for example, the translation errors contributed to an adverse credibility finding, the Board of Immigration Appeals assumed credibility and still found that what she experienced in Ethiopia either did not rise to the level of persecution or was not shown to be motivated by one of the five enumerated grounds. For example, the lack of a nursing license. She said that she was not able to obtain a nursing license, but the explanation was something that her family had a disagreement with the nursing school's director years ago. And even assuming that that's true, that certainly is not motivated by one of the five enumerated grounds. It also can't show the type of economic deprivation that this Court has found to constitute a threat to life or freedom. Her asylum application also indicates that she did work for 27 years while she was in So what the BIA simply found was that even taken as true everything that she provided, including the explanations for what she thought contributed to the adverse credibility finding, what she experienced did not rise to the level of persecution. And certainly the evidence before the Board of Immigration Appeals and the evidence before this Court doesn't compel a finding, one, that it was motivated by one of the five enumerated grounds, and that it was also persecution. So there's just simply not evidence in this record that would compel a different finding by this Court. So what the government's position obviously is, is that if there are problems with translation that she identified, they were explained to the Board of Immigration of Appeals. She has not established prejudice. To establish prejudice, she would have to show that any of the translation errors would have had an adverse outcome or affected the outcome of the proceeding. And she can't do that here, one, because the Board of Immigration of Appeals took an alternate finding that even assuming what she said is true, it doesn't rise to the level of persecution. Again, what the BIA found was more along the lines of discrimination and harassment. And no one's saying that what she experienced in Ethiopia was nice or pleasant, but it's simply what this Court has found to be persecution. It does not rise to that level. Your Honor, I wish I knew where the tape went. Our office doesn't have it, but our office wouldn't have it. But all I know is that the opposing counsel has made numerous requests to, I believe, the immigration court, the Board of Immigration of Appeals, and perhaps the transcription service, and they have not received it. But what efforts have you made to find the tape? The government has responded to the requests of opposing counsel to find it. I know that there was a FOIA request, and my office personally doesn't handle FOIA requests. But don't you think that given that you're arguing on behalf of the Department of Justice to deport Vente, and she's claiming that much of the adverse credibility and much of the reason for her deportation is because she can't get the original tapes, don't you have an obligation to look for them or to contact the other offices that might have them and search them out? I mean, obviously, you managed to come up with your own version of a translation of them. And how do we, how can we verify that that's correct? Obviously, the tapes would be the best evidence to show what was... You're not answering my question. Don't you have an obligation to look for the tapes? The government... Your office, the prosecutors here, the people are arguing... Well, no, I'm sorry. I'm thinking amongst the civil, criminal, right. The people who are relying on the tape, are relying on the tape to deport her. Don't you have an obligation to have the tape? The government has responded to the request. As far as me personally trying to find out where these tapes are... You've done nothing, right? Me personally? Yes. I have done nothing to find the tapes other than... Don't you think it's good before you come here and argue that she should be deported based on the translation of these tapes? Don't you think you or your office should do something? Given that she has provided the Board of Immigration of Appeals with her version of what she said at the hearing... That doesn't answer my question. Does your office have any obligation to provide the tapes? To look for the tapes? Obviously, you're in a superior position than FinTech to get the tapes. Are we talking about the attorney's office or are we talking about the immigration service office? I'm so confused by how many different offices they have. You're absolutely right that the government is responsible for the tapes. We can go into the fact that I work for the Civil Rights Division and I'm doing this case because there's an overload of immigration cases. That's not relevant. Shouldn't someone within there have the obligation to search for the tapes? I believe a search has been done, and what the response has been is that they cannot find it. They have gone to the immigration court. They've gone to the transcription service. They've gone to the BIA, and they don't have the tape. I know it's not in my office. I wish we had the tape. Obviously, I wish we had the tape because then it could be easily resolved, but I think what we do have is the petitioner's relation to the Board of Immigration of Appeals. Shortly after the hearing, she went through the transcription with another translator. She didn't say that, by the way, I have the tape. See, the difference is you need to have the original tape of what she said and what she was asked. If she had the original tape to go through the translation, that would put her in a better position. Sure, to the extent that any perceived miscommunications or mistranslation affected the adverse credibility finding. But we also have her statement that was accompanying her asylum application, and she has never said her statement was subject to mistranslations or omissions. And what is in her statement simply doesn't rise to the level of persecution. That's what the immigration judge found in the Board of Immigration of Appeals saying, if we believe your statement, if we look at your brief to the BIA, if we look at the explanations you provided, and if we look at the immigration hearing transcript and assume credibility. And, again, all they're saying is that the potential miscommunications contributed to an adverse credibility finding. But if we assume credibility, what you experienced and what's set forth in your statement, and, again, the supplemental answer is to the Board, it doesn't rise to the level of persecution. So there were two findings that were made. There was an adverse credibility finding, and then there was a backstop, backstop. Even if we assume credibility, what you experienced did not rise to persecution, and you don't have a well-founded fear of future persecution if you were returned to Ethiopia. And so based on the evidence in the record, all of it, that certainly does not compel a finding that she did, in fact, experience persecution or have a well-founded fear of persecution if she were to be returned to Ethiopia. Again, I wish we had the tape, but I don't think that this case needs it. But should we, I mean, in civil cases, even in criminal cases, sometimes judges require sort of an affidavit of what you did to actually search for the tape when it's critical. Because although we have her asylum statement, those aren't the only facts that come in. Why else do you do an interview and tape it and translate it, right? Because more facts come out, and there's the individual testimony, which if, as you say, the BIA would do an alternative analysis based on the credibility, then the tapes would be pretty important. Again, if all the IJ or the BIA found was that she was not credible, and she was not credible because there were translation errors, then I think the tape takes a much higher status of how necessary it is. But given that there was an additional finding that even if credible, even if we assume everything that happened, that you didn't get a nursing license, that your home was taken away and that your husband was arrested and your arm was hurt, that does not rival the three attacks she cites. The first time the government is aware of the three arrests was in a brief to the to this court. I don't think they're in the tapes. Perhaps they are in the tapes. That would be her husband. And I don't think that she's shown that anything that happened to her husband can be attributed to her. So that would go, certainly, if her husband was applying for asylum, if you could show that that was motivated by one of the five enumerated grounds. But I think there's a tenuousness relationship there that she herself was never arrested. I would like to mention one thing about the Hearsay case that Pozen Counsel just presented, and that was what she was explaining, that her daughter had been arrested. The case goes on to say where an asylum applicant's testimony consists of Hearsay evidence which is not susceptible to cross-examination. The statements by the out-of-court declarant need not be automatically taken as true and compared to non-Hearsay evidence may be quoted less ways. We'll read the case. You're well over your time. Okay. We'll look at it. I'm sorry? We'll look at the case. Thank you very much. Can I take a minute with Mr. Sterling, please? Mr. Sterling, I've looked at your certification on both your opening brief and your reply brief. They differ materially in what they say. And, in fact, your opening brief is not 14-point type. I hope we never see another brief of yours that is using such small type. And you can get from our clerk's office in San Francisco a standard certification form where you just check the box as to what rule you're following in compliance with the briefing. But some of us are getting along, and our eyes are not as good as they were, and when we've got to read real small type, we have to practically get a magnifying glass to read it. So please comply with the rule. Thank you, Your Honor. I apologize for any mistake and a bit of work. Do I know anything about voluntary departure? Okay. Your Honor, her visa had expired after her asylum petition was filed, so it was not voluntary departure. It was a deportation order. All right. Thank you very much. Fante v. Gonzalez is submitted.
judges: Beezer, Hall, Wardlaw